IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SAMUEL DAVIS, | ) | |
| #185728, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-CV-400-CSC |
| | ) | |
| DR. WILSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Plaintiff Samuel Davis, an inmate proceeding *pro se*, filed this 42 U.S.C.
§ 1983 action. Doc. 1. The Complaint names Warden Walter Myers, Correctional Officer
Linda Drake, Dr. Philip Wilson, CRNP Laura Driggers, and CRNP Charlene McMullen
as defendants, all of whom worked at Easterling Correctional Facility at the time of the
alleged events. *Id*. at 1, 2; *see also* Docs. 30, 46. It appears to allege that some or all of
the Defendants delayed or denied Plaintiff adequate medical care after he slipped and fell
in December 2019. Doc. 1-1. As relief, Plaintiff seeks "[t]rail [sic] by jury and allow the
jury to [determine] the awards." Doc. 1 at 4.

On July 14, 2020, the Court issued an Order directing Defendants to file a Special
Report addressing Plaintiff's claims. Doc. 5. Defendants Wilson, Driggers, and
McMullen filed their joint Special Report on August 14, 2020 (Doc. 30), and Defendants
Myers and Drake filed their joint Special Report on September 16, 2020 (Doc. 46). In

their Reports, Defendants move for summary judgment (Docs. 30 at 27; 46 at 12) and provide evidentiary materials in support (Docs. 30-1 through 30-3; 46-1 through 46-2). Defendants further filed several supplements to their Reports with additional evidentiary materials. *See* Docs. 40, 50, 59. On September 28, 2020, the Court issued another Order directing Plaintiff to file a response to Defendants' filings with affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 51. Plaintiff filed two responsive filings. Docs. 57, 61.

In its September 28 Order, the Court notified the parties that, absent any objections, it may thereafter treat Defendants' Reports, as supplemented, and Plaintiff's response as motions for summary judgment and a response. Doc. 51 at 3. No objections were filed. Accordingly, the undersigned will now construe Defendants' Special Reports as motions for summary judgment and, for the reasons set forth below, grant summary judgment in favor of Defendants.

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable

trier of fact to find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248). "An issue is 'material' if it might affect the outcome of the case under the governing law." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B).

If the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)–(3).

"In reviewing whether the nonmoving party has met its burden, the [C]ourt must stop short of weighing the evidence and making credibility determinations of the truth of the matter." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998–99 (11th Cir. 1992) (citation omitted). "Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 999 (citations and internal quotations omitted). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

### III.    RELEVANT FACTS[1]

The following facts derive from Plaintiff's verified Complaint (Doc. 1); the sworn or verified evidentiary materials proffered by Defendants (Docs. 50-1 through 50-6; 59-1); and Plaintiff's verified responses (Docs. 57, 61).

The Complaint alleges that, in May 2019, Plaintiff underwent surgery on his back. Doc. 1-1 at 1. In December 2019, while at Easterling Correctional Facility, Plaintiff slipped and fell in the bathroom, hurting his back. *Id*. After Plaintiff's fall, "it was reported to [Defendant Drake]" and "she explain that [Plaintiff] need to shut up and go sit down." *Id*. Plaintiff then waited until they called chow call "to talk to somebody with rank," at which time he "explain to Captain Jenkins what had happen and ask him would he allow [Plaintiff] to go see Ms. Johnson in mental help." *Id*. Ms. Johnson then "got [Plaintiff] over to the medical unit." *Id*. There, Plaintiff told the nurse he had fallen, and "she got [him] over to see [Defendant McMullen]," who requested that an x-ray be taken. *Id*. After the x-ray came back, Defendant McMullen "was not satisfied with [it]," so she consulted with Defendants Driggers and Wilson, and they sent Plaintiff to get an MRI. *Id*. After Dr. Wilson read the MRI, "he said that there's nothing else he could do, so he sent [Plaintiff] back to [the] doctor who did [Plaintiff's] back s[u]rgery" in May 2019. *Id*. That doctor requested another MRI be taken of Plaintiff's neck. *Id*. At the time of this lawsuit—filed six days after Plaintiff's second MRI—that doctor had not yet read Plaintiff's MRI results. *Id*.

---

[1] The "facts" set forth herein are merely for purposes of resolving summary judgment and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) ("[W]hat we state as 'facts' . . . for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.").

In response, Defendants proffer evidence—including their own affidavits and Plaintiff's medical records—which sets forth the following version of events.

On July 8, 2019, a referral was made for Plaintiff to be seen by a neurosurgeon in Mobile, Alabama. Doc. 50-2 at 7. The referral request stated as follows:

Presumed diagnosis:

Lumbar spinal stenosis, disc herniation, chronic progressive back pain.

Describe signs and symptoms:

56 year old AAM with back pain since 2009. Had surgery in 2017, then April and May of 2019. Last visit with surgery was 6/29/19. Was supposed to f/u in five weeks. Incarcerated before f/u. Also states he suffered a fall since incarceration. Continues to have pain.

Doc. 50-2 at 7.

On December 2, 2019, Plaintiff was seen in the Healthcare Unit at Easterling, where he informed the nurse that he had fallen. Doc. 50-1 at 2. His medical notes indicate that he had fallen, he was in chronic pain due to his back, and his whole body felt numb. *Id*. The notes further indicate that Plaintiff walked with a cane and utilized a back brace. *Id.* That same day, the medical provider at Easterling ordered Plaintiff's medical records from Providence Hospital from 2017 through 2019. *Id*. Those records demonstrate that Plaintiff had lumbar surgery on May 8, 2019, carpel tunnel surgery on March 24, 2019, and neck surgery on April 24, 2017, all of which occurred prior to Plaintiff's incarceration. *Id*.

On December 4, 2019, a lumbar x-ray was ordered. *Id*. The x-ray was read by the radiologist as follows:

Examination: Lumbar spine 2-3 V

Reason for exam: Chronic pain.

Findings:

Mild degenerative dextroscoliosis apex at L3. There are diffuse spondylotic changes. Findings are demonstrated by diffuse disc space narrowing, osteophyte formation and degenerative end plate sclerosis. There is diffuse facet joint arthropathy with secondary bilateral neural foramina narrowing. No fracture or dislocation is seen. No aggressive lytic or blastic bony lesion is noted.

Impression: Moderate diffuse spondylosis.

Doc. 50-2 at 4.

Due to Plaintiff's continued complaints of back pain, he was seen again on December 16, 2019, at which time he was referred to the Dale Medical Center in Ozark, Alabama. *Id*. Medical records from the Dale Medical Center reveal that Plaintiff complained of left side pain and numbness but denied any new injury. *Id*. Plaintiff was prescribed Augmentin. *Id*. Upon return to Easterling, Plaintiff reported to the intake medical provider that "they gave [him] a pain shot and told [him] to take some [antibiotics]." *Id*.

On December 23, 2019, Plaintiff was seen in the chronic disease clinic related to his high blood pressure and GERD. *Id*. at 5. That same day, Plaintiff's longstanding medical profiles were extended, including a cane profile and no prolonged standing profile. *Id*.

On January 7, 2020, a referral was made for an MRI of the lumbar sacral spine. Doc. 50-1 at 3. On January 30, 2020, Plaintiff was sent to Jackson Hospital, where an MRI of the lumbar spine was taken. *Id*. The MRI was read by the radiologist as follows:

Exam: JIC MRI lumbar w/o /T/W\Contra

History: Numbness and weakness lower extremities[]

Findings:

Lumbar spine alignment the bone marrow signal and conus medullaris appear satisfactory. The L1-2, L2-3 and L3-4 discs appear satisfactory.

L4-5 there is some facet joint hypertrophy and disc bulging. No central spinal stenosis or neural from stenosis.

L5-S1 There appears to be some vacuum disc phenomena and some disc bulging. There is neural foraminal stenosis. Posterior laminectomy changes. There is some enhancing scar tissue in the posterior paraspinal tissues at operative site.

Impression:

L5 laminectomy changes and L4-5 laminectomy changes. There is neural foramina stenosis at L5-S1, L5-S1 disc bulge.

Doc. 50-2 at 6. Upon return from his off-site appointment, Plaintiff informed the intake nurse that he had an MRI, and it was noted that Plaintiff had an MRI without any emergent findings. *Id*.

On February 18, 2020, Plaintiff was again seen and evaluated, at which time it was noted that he was claiming chronic low back pain and that he had previously suffered from lumbar spinal stenosis and had a disc bulge. *Id*.

On March 31, 2020, Plaintiff was sent out and seen by Shawn Clark, M.D., a neurosurgeon. Doc. 50-1 at 4. Dr. Clark's notes from that date state in part:

Reason for appointment:

1.      F/u, lumbar MRI L Spine at Jackson Imaging, pt. to bring CD.

History of present illness:

New symptoms

F/u lumbar. After being sentenced on 7/8/2019, pt was unable to f/u for the
next appt. Pt states he fell while in prison on 12/2/2019 and injured his
lower back, back of the neck into both shoulders and bilateral leg pain. Pt
also still has numbness in the R hand since the surgery. Pt states due to
being in custody, he is not allowed to take meds and he's sleeping on a hard
cot which is worsening back pain. Pt had scan done on 1/30/20, however, pt
only has scan he was unable to bring disc.

*Id*. On May 14, 2020, an MRI of Plaintiff's cervical spine was taken at Jackson Hospital

in Montgomery, Alabama. *Id*. The MRI was read by the radiologist as follows:

Exam: JIC MRI cervical w/o contrast

History: Cervicalgia[]

Findings:

Bones: Prior ACDF extending from C3-C5. Bone marrow signal is within
normal limits.

Paravertebral soft tissues: Within normal limits.

Evaluation by level:

C2-3: Disc bulge and facet arthropathy with uncovertebral hypertrophy.
There is effacement of ventral thecal sac and mild bilateral neural foraminal
narrowing.

C3-4: Fusion hardware at this level. Facet arthropathy and uncovertebral
hypertrophy result in moderate to severe left and moderate right neural
foraminal narrowing.

C4-5: Fusion hardware at this level. Facet arthropathy and uncovertebral
hypertrophy results in moderate bilateral neural foraminal narrowing. There

is a moderate size disc bulge at this level which causes moderate spinal canal narrowing.

C5-6: Broad based disc bulge and facet arthropathy with uncovertebral hypertrophy. There is moderate to severe left and moderate right neural foraminal narrowing and mild to moderate spinal canal narrowing.

C6-7: Facet arthropathy uncovertebral hypertrophy. No significant spinal canal narrowing. Minimal bilateral neural foraminal narrowing.

C7-T1: No significant spinal canal or neural foraminal narrowing.

Spinal cord: Normal in course and caliber. There is some patchy increased signal within the cervical cord extending from the C3-C5 level, compatible with myelopathy.

Impression: Prior ACDF extending from C3-C5 with adjacent spondylosis most notable at the C2-3 level. Other levels detailed above.

Patchy increased signal within the cervical cord extending from the C3-C5 level, compatible with myelopathy.

Doc. 50-2 at 8–9.

On May 19, 2020, Defendant Driggers personally saw Plaintiff, at which time she performed an examination and assessment and reviewed the conclusions from the MRI. Docs. 50-1 at 4–5; 50-2 at 7.

On June 9, 2020, Plaintiff had a follow up appointment with Dr. Clark, the neurosurgeon, who noted that Plaintiff's "MRI shows no active cord compression or fracture" and recommended conservative methods of pain relief including physical therapy and "a thicker sleeping surface." Doc. 50-2 at 9–11. Throughout June and July 2020, Plaintiff attended several physical therapy sessions for his continuing back pain and failed to show for multiple sick call appointments with medical providers at Easterling. Docs. 50-1 at 5–6; 50-2 at 11–12.

Defendant Drake does not recall Plaintiff ever telling her about a fall, and she denies using profanity with Plaintiff or refusing to get him necessary medical treatment. Doc. 59-1 at 1. She avers that, if she had seen any inmate fall, she would have immediately and without delay arranged for that inmate to be taken to the Healthcare Unit. *Id*. She further claims that she has always ensured that any inmate that needs medical treatment is transported to the Healthcare Unit without delay and that she has never made an inmate wait a long time before receiving necessary medical attention. *Id*. at 1–2. Defendant Myers avers that he has no knowledge of the incident, Plaintiff's alleged medical issues, or the healthcare provided to Plaintiff at Easterling. Doc. 50-5 at 2.

> In response to Defendants' filings, Plaintiff reiterates:
>
> Plaintiff . . . fell and hurt his back. He requested for [Defendant] Drake to get him to medical, because he was hurting. [Defendant] Drake use[d] profanity and told [Plaintiff] to go set down [sic]. [Plaintiff] tried to tell the officer his back was hurting. [Defendant] Drake ingored [sic] [his] complaint and it was obious [sic] by the back brace and cane that [Plaintiff] had medical issues.

Doc. 57 at 3. He further "admits that [Defendant] Myers is not directly involved in the constitutional violation by [Defendant] Drake." *Id*. at 4. However, he maintains that Defendant Myers is nevertheless responsible for the actions of other officers under the doctrine of *respondeat superior*. *Id*.

Finally, he claims that the evidence demonstrates that the medical defendants were aware of his medical needs—i.e., that he suffers from back pain. *Id*. at 5–7. However, he claims that "[t]he defendants are deliberate indifference when [Plaintiff's] appointments

11

are cancelled." *Id*. at 7. Specifically, "[a]ppointments were cancelled on June 17, 2020 [and] June 24, 2020" and rescheduled for June 29, 2020. *Id*. Plaintiff was also "scheduled for therapy for July 1, 2020[,] but the therapy does not work [and] only cause more pain." *Id*.

## IV. DISCUSSION

### a. Purported Claims Against Defendant Myers

As an initial matter, the Complaint does not contain any factual allegations regarding Defendant Myers. *See generally* Doc. 1. The Eleventh Circuit has demonstrated that dismissal of a defendant is proper where a complaint fails to state any allegations that associate the named defendant with a constitutional violation. *Douglas v. Yates*, 535 F.3d 1316, 1322 (11th Cir. 2008) (citing *Pamel Corp. v. Puerto Rico Highway Auth.*, 621 F.2d 33, 36 (1st Cir. 1980) ("While we do not require technical niceties in pleading, we must demand that the complaint state with some minimal particularity how overt acts of the defendant caused a legal wrong.")); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating that a pleading must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests") (citation omitted).

Moreover, in his response to Defendants' filings, Plaintiff "admits that [Defendant] Myers is not directly involved in the constitutional violation by [Defendant] Drake," but he nevertheless believes that Defendant Myers is "indirectly responsible for the actions of the officers" under the doctrine of *respondeat superior*. Doc. 57 at 4. However, it is well-settled that supervisory personnel cannot be held liable under § 1983 under a theory of *respondeat superior* or vicarious liability. *See Monell v. Dep't of Soc.*

*Servs.*, 436 U.S. 658, 691–95 (1978) (holding doctrine of *respondeat superior* inapplicable to § 1983 actions); *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994) (holding that plaintiff cannot hold supervisory officials liable for the actions of their subordinates under a theory of *respondeat superior* or vicarious liability under § 1983).

Accordingly, because the Complaint fails to state any allegations whatsoever associating Defendant Myers with a constitutional violation, and because there is no evidence whatsoever that Defendant Myers violated Plaintiff's constitutional rights through his own actions, Defendant Myers is entitled to summary judgment.

**b.     Purported Deprivation of Medical Care Claim against Defendants Drake, Wilson, Driggers, and McMullen**

Second, to succeed on an Eighth Amendment deprivation of medical care claim, a plaintiff must demonstrate at least two elements. First, he must demonstrate "an objectively serious medical need . . . that, if left unattended, pos[es] a substantial risk of serious harm." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal quotations and citations omitted). "[A] serious medical need is [one] diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citation omitted). Second, he must demonstrate that the defendant's response, or lack thereof, was "poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in

diagnosi[s] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (quoting *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

"[T]o show the required subjective intent to punish, [the] plaintiff must demonstrate that the [defendant] acted with an attitude of 'deliberate indifference.'" *Id*. (quoting *Estelle*, 429 U.S. at 105). A finding of deliberate indifference requires that the defendant "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists [and that he] also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (noting that an Eighth Amendment violation occurs only where the defendant actually "knows of and disregards an excessive risk to inmate health or safety"). "When the need for treatment is obvious, medical care that is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Simpson v. Holder*, 200 F. App'x 836, 839 (11th Cir. 2006) (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)). However, a "simple difference in medical opinion" does not constitute deliberate indifference. *Simpson*, 200 F. App'x at 839 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

### i.   Defendant Drake

As to Defendant Drake, Plaintiff repeatedly avers that, after he fell, he asked Defendant Drake "to get him to medical, because he was hurting." Doc. 57 at 3. However, Defendant Drake used profanity and told Plaintiff to go sit down. *Id*. After an unspecified period of time, another prison official permitted Plaintiff to go to the Healthcare Unit. Doc. 1-1 at 1. Upon consideration, the undersigned finds that this

testimony—accepted as true—fails to demonstrate that Defendant Drake violated the Eighth Amendment.

The Court will assume, for purposes of this Order, that Plaintiff's chronic back pain constitutes a serious medical need under the Eighth Amendment. *Compare, e.g., Monteleone v. Corizon*, 686 F. App'x 655, 660 (11th Cir. 2017) ("[W]e . . . accept that [plaintiff's] degenerative disk disease, spinal stenosis, and compressed disks with sciatica nerve pain, constitute a serious medical need."); *Kershaw v. S. Corr. Med.*, No. 5:18-CV-186, 2019 WL 6337440, at *4–5 (M.D. Ga. Oct. 28, 2019) (finding plaintiff's subjective complaints of chronic pain, supported by a prior hip surgery and prior pain medication prescription, did not constitute a serious medical need). However, even making such an assumption, Plaintiff has nevertheless failed to demonstrate deliberate indifference to that need.

In *Monteleone v. Corizon*, the Eleventh Circuit found that, although the plaintiff's chronic back pain was sufficient to constitute a serious medical need, he nevertheless failed to establish deliberate indifference by the defendant because he failed to "provide[] evidence showing that [defendant] had substantial knowledge of a risk of serious harm to [plaintiff] if he did not receive successful treatment for his chronic back pain." 686 F. App'x at 660. The Court further found that the defendant's two-and-a-half-week delay in treating the plaintiff did not amount to deliberate indifference because the plaintiff did not "provide[] evidence demonstrating that if left unattended, his back pain 'pose[d] a substantial risk of serious harm.'" *Id*. (quoting *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994)).

In its decision, the Eleventh Circuit specifically noted that a delay in necessary medical treatment for non-medical reasons may establish deliberate indifference *if* the plaintiff provides evidence that the delay in treating the need worsened the condition. *Id*. at 658 (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009)); *see also Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) ("In cases that turn on the delay in providing medical care, rather than the type of medical care provided . . . [w]here the prisoner has suffered increased physical injury due to the delay, [the Eleventh Circuit] ha[s] consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay.").

Here, Plaintiff alleges simply that he told Defendant Drake he fell and that he was "hurting." However, he does not provide any evidence that Defendant Drake was aware his condition posed a substantial risk of serious harm—or an excessive risk to his health or safety—if not immediately treated or that the pain was so severe that a delay in treatment deprived Plaintiff "of the minimal civilized measure of life's necessities." *See Brennan v. Thomas*, 780 F. App'x 813, 820 (11th Cir. 2019) (citation omitted). Indeed, "a plaintiff's statement that he experienced some pain or discomfort is not enough." *Id*. at 821; *see also Burley v. Upton*, 257 F. App'x 207, 210 (11th Cir. 2007) (noting that lower back pain, without more, does not pose a substantial risk of serious harm if left untreated).

Nor has Plaintiff demonstrated that the indeterminate delay caused by Defendant Drake worsened his condition. Indeed, the medical evidence demonstrates that Plaintiff has suffered chronic back pain since at least 2009, long before his December 2, 2019 fall

at Easterling. It demonstrates that Plaintiff underwent a lumbar x-ray on December 4, 2019—two days after he was examined in the Healthcare Unit for his fall—and there is nothing in the record that indicates Plaintiff's condition worsened over that two-day period. The results of that x-ray specifically indicate that Plaintiff did not suffer a fracture or dislocation from his fall. Doc. 30-2 at 26. On December 16, 2019, Plaintiff reported to medical personnel that he suffered from chronic back pain but denied any new injury. Doc. 30-2 at 28.

The record evidence, as well as Plaintiff's relatively bare allegations that his back was hurting, simply fail to demonstrate that Defendant Drake was aware Plaintiff's condition posed "an excessive risk to [his] health or safety," *Campbell*, 169 F.3d at 1363, or caused anything more than mere discomfort, *see Hunt v. Warden*, 748 F. App'x 894, 900 (11th Cir. 2018) ("[A] prisoner's mere discomfort, without more, does not offend the Eighth Amendment.") (citation omitted).[2] To the extent Defendant Drake may have acted inadequately or negligently by using profanity and telling Plaintiff to sit down when he asked to go to the Healthcare Unit, and while the Court certainly does not condone such conduct, it is well-established that accidental inadequacy and negligence do not amount to deliberate indifference. *See Estelle*, 429 U.S. at 106.

---

[2] Although Plaintiff appears to believe that his use of a cane and brace should have put Defendant Drake on notice of "medical issues" (Doc. 57 at 3), "an official's failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Moreover, whether Defendant Drake was in fact aware that Plaintiff had "medical issues" in a general sense does not establish that she was aware of a serious risk of harm to Plaintiff or that Plaintiff was in severe pain. Under these particular circumstances, in which Plaintiff merely asserts that he was "hurting" and there is no evidence that Plaintiff's condition worsened as a result of Defendant Drake's inaction, the Court cannot find that Plaintiff's mere use of a cane and brace, without more, is sufficient to impose liability on Defendant Drake.

Thus, based on the evidence, the Court cannot find that Defendant Drake's conduct under these particular circumstances was "poor enough to constitute 'an unnecessary and wanton infliction of pain,'" *Taylor*, 221 F.3d at 1258 (quoting *Estelle*, 429 U.S. at 105–06), or that her actions were "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (citing *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)). Accordingly, Defendant Drake is entitled to summary judgment.

### ii.     Defendants Wilson, Driggers, and McMullen

Similarly, even assuming Plaintiff has demonstrated a sufficiently serious medical need, he has failed to demonstrate that Defendants Wilson, Driggers, or McMullen—the medical defendants—were deliberately indifferent to that need. Plaintiff admits that, upon being seen by Defendant McMullen the day he fell, she immediately ordered a lumbar x-ray; that Defendant McMullen then consulted with Defendants Driggers and Wilson regarding the x-ray results; that, upon consulting with one another, Defendants then sent Plaintiff to get an MRI; that Defendant Wilson then sent Plaintiff to see the doctor who performed his back surgery; that Plaintiff's surgeon requested another MRI be taken of Plaintiff's neck; and that Plaintiff received that MRI. Doc. 1-1 at 1. The objective medical records further demonstrate that Plaintiff was seen numerous times by medical personnel regarding his chronic back pain and other ailments; that he was sent to outside specialists, issued numerous medical profiles, and given physical therapy in an effort to

alleviate his ongoing pain; and that he underwent numerous x-rays and MRIs to examine his condition.

There is nothing in the record to suggest that any of the medical defendants' conduct was "poor enough to constitute 'an unnecessary and wanton infliction of pain.'" *Taylor*, 221 F.3d at 1258 (quoting *Estelle*, 429 U.S. at 105–06). To the contrary, it appears that medical personnel made numerous, varied efforts to alleviate Plaintiff's pain symptoms, including examining him on multiple occasions, sending him to outside medical consultants, ordering x-rays, MRIs, and Plaintiff's medical records, issuing him various medical profiles, and sending Plaintiff to physical therapy. Regardless of whether Defendants' efforts were ultimately *effective* at lessening Plaintiff's pain, this is certainly not a situation in which Plaintiff received medical care so cursory as to amount to no treatment at all. *See Simpson*, 200 F. App'x at 839.

To the extent Plaintiff believes he should have received *different* treatment of some sort, Defendants' failure to provide him with his preferred course of treatment— whatever that may be—does not amount to deliberate indifference. *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("Where a prisoner has received medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law."). There is simply nothing before the Court sufficient to demonstrate that Defendants Wilson, Driggers, or McMullen intentionally or deliberately

disregarded Plaintiff's serious medical need or an excessive risk to his health or safety.[3] Accordingly, Defendants Wilson, Driggers, and McMullen are entitled to summary judgment.

## V.    CONCLUSION

Accordingly, based on the foregoing, it is ORDERED that:

1.    Defendants' Special Reports (Docs. 30, 46), which the Court construes as motions for summary judgment, are GRANTED;

2.    Judgment is ENTERED in favor of Defendants; and

3.    This case is DISMISSED with prejudice.

Final Judgment will be entered separately.

DONE this 25th day of September, 2023.


/s/ Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

---

[3] To the extent Plaintiff vaguely alleges someone cancelled two of his medical appointments and rescheduled them for approximately a week later (*see* Doc. 57 at 7), he neither identifies who cancelled his appointments nor demonstrates how such rescheduling harmed him or violated his constitutional rights.